# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

WILDEARTH GUARDIANS,

       Plaintiff,

v.                                          No. CIV 12-118 LFG/KBM

JAMES LANE, Director of the New Mexico
Department of Game and Fish, sued in his
official capacity; and JIM McCLINTIC,
Chairman of the New Mexico State Game
Commission, sued in his official capacity,

       Defendants,

and

NEW MEXICO TRAPPERS ASSOCIATION,
NEW MEXICO COUNCIL OF OUTFITTERS
& GUIDES, INC., NEW MEXICO FARM &
LIVESTOCK BUREAU, COALITION OF
ARIZONA/NEW MEXICO COUNTIES FOR
STABLE ECONOMIC GROWTH, UNITED
SPORTSMEN FOR FISH AND WILDLIFE, INC.,
NEW MEXICO CATTLE GROWERS' ASSOCIATION,
NEW MEXICO WOOL GROWERS, INC.,
AND NEW MEXICO FEDERAL LANDS COUNCIL,

       Defendant-Intervenors,

and

ARIZONA GAME AND FISH COMMISSION,

       Amicus Curiae.

## MEMORANDUM OPINION AND ORDER[1]

---

[1] The issues before the Court are of substantial importance and compel a thorough and thoughtful consideration of the parties' arguments and authorities. This lawsuit impacts the effective and efficient management of government under applicable law and also critical environmental issues involving the management and protection of the Mexican gray wolf. The Court expresses its thanks and appreciation to the parties and Amici for their advocacy and their thorough, comprehensive arguments and briefing.

THIS MATTER is before the Court on Defendants' motion to dismiss[2] [Doc. 19] and the parties' and intervenors' cross motions for summary judgment [Doc. Nos. 11, 71, 72.] The motions are fully briefed. [Doc. Nos. 47, 49, 58, 60, 83, 89.] The Court determines that oral argument is not necessary.  After careful consideration of the pertinent law, pleadings and attachments, intervenors' pleadings,[3] the parties' errata and additional declarations, along with the amici curiae briefing, the Court concludes that Defendants' motion to dismiss should be granted.  Additionally, the Court concludes that summary judgment should be granted in favor of Defendants.

## **Procedural Summary**

On February 7, 2012, Guardians filed its Complaint for Declaratory and Injunctive Relief ("complaint") against Defendant James Lane, Director of the New Mexico Department of Game and Fish, and Jim McClintic, Chairman of the New Mexico State Game Commission ("Defendants" or "Defendant Lane" or "Defendant McClintic"). [Doc. 1.]   Guardians challenges Defendants' "continued authorization of trapping within the occupied range of the critically endangered Mexican gray wolf . . . without exercising due care to avoid trapping these wolves." [Id., at 1.] Guardians alleges that Defendants are in violation of specific sections of the Endangered Species Act ("ESA") and seeks a declaratory judgment to this effect and an injunction requiring Defendants to comply with the law. [Id., at 1-2.]

---

[2]The Court did not grant Plaintiff's request to convert Defendants' motion to dismiss to one brought under Rule 56, for summary judgment.  Instead, the Court directed the parties to file cross motions for summary judgment. [Doc. 65.] However, in granting the motion to dismiss, the Court did not look outside the pleadings and did not examine exhibits.

[3]On April 30, 2012, the Defendant-Intervenors filed a "Proposed Joinder" to Defendants' motion to dismiss.  They added no new argument but joined the arguments presented by Defendants.  [Doc. 23.] The proposed joinder was docketed as a motion for joinder, which the Court now grants.

Specifically, Guardians' Complaint seeks declarations that Defendants Lane and McClintic violated and continue to violate 16 U.S.C. § 1538(a)(1)(B) (or ESA § 9) and 50 C.F.R. § 17.84(k) (or special rule) by authorizing trapping within occupied wolf range without first exercising due care to avoid taking a Mexican gray wolf.  Guardians also requests an injunctive order requiring that Defendants exercise due care to avoid taking Mexican gray wolves before authorizing any trapping within occupied wolf range. [Doc. 1, at 15-16.]

On April 6, 2012, Guardians filed a motion for summary judgment.  That motion is fully briefed.  [Doc. Nos. 11, 31, 32, 43, 44, 45, 46, 58, 59.]  On April 23, 2012, in lieu of filing an answer, Defendants filed a motion to dismiss. [Doc. Nos. 19, 23, 29, 33, 48, 49.] On July 23, 2012, the Court directed Defendants to file a cross motion for summary judgment, in accordance with Defendants' statement that they planned to file their own cross motion. [Doc. 31, n.1.]  That motion also is fully briefed. [Doc. Nos. 65, 71, 77, 82, 88.]  Proposed intervenors were allowed to participate and filed a separate cross motion. [Doc. Nos. 72, 78, 85.]  The Arizona Game and Fish Commission was allowed to file an *amicus curiae* brief. [Doc. Nos. 76, 81, 88.]  The Court considered all of the pleadings, with attachments, for purposes of summary judgment.

### **Mexican Gray Wolf** (*Canis lupus baileyi*)

The Mexican gray wolf or "lobo," is "the smallest, rarest, and most genetically distinct subspecies of gray wolf."  Wildearth Guardians v. U.S. Forest Serv., 668 F. Supp. 2d 1314, 1319 (D.N.M. 2009).  The Mexican gray wolf once numbered in the thousands across much of New Mexico, Arizona, Texas, and northern Mexico until "federal eradication efforts undertaken to benefit the livestock indirectly drove the subspecies to near extinction."  Id. (citation omitted).

In April 1976, the Mexican gray wolf was listed as an endangered subspecies.  Wyo. Farm Bureau Fed'n v. Babbitt, 199 F.3d 1224, 1238 n. 11 (10th Cir. 2000) (*citing* 63 Fed. Reg. 1752 (Jan. 12, 1998)).

> Like the *irremotus* [Northern Rocky Mountain Wolf] listing, this listing was superceded by the 1978 reclassification designating the entire species of gray wolf as endangered. However, unlike *irremotus*, identifiable, captive populations of the Mexican gray wolf exist and are the subject of an independent reintroduction program in east-central Arizona and west-central New Mexico. . . .

Id. (citations omitted).  The gray wolf species in North America, south of Canada, was listed as endangered in March 1978, except in Minnesota where it was listed as threatened.  63 Fed. Reg. 1752.  The subspecies of the Mexico gray wolf "is now considered extirpated from its historic range in the south western United States because no wild wolf has been confirmed since 1970."  Id. at 1753.

A "Mexican Wolf Recovery Plan" was adopted in 1982, with an objective "to conserve and ensure survival of the Mexican gray wolves by maintaining a captive breeding program and re-establishing a viable, self-sustaining population of at least 100 Mexican wolves in a 5,000 square mile area within the subspecies' historic range."  Id.  The captive breeding program was initiated between 1977 and 1980.  (*See* additional discussion *infra* under "special rule".)

### Endangered Species Act ("ESA")

"Congress enacted the Endangered Species Act in 1973 'to provide for the conservation, protection, restoration and propagation of *species* of wildlife facing extinction.'" Wyo. Farm Bureau Fed'n, 199 F.3d at 1231 (internal citation omitted) (emphasis in original).  "When Congress passed the Act in 1973, it was not legislating on a clean slate."  Tennessee Valley Authority v. Hill, 437

U.S. 153, 174-75 (1978).  For example, in 1966 and 1969, Congress passed legislation intended to

protect endangered species.  Id.

> Despite the fact that the 1966 and 1969 legislation represented "the most comprehensive of its type to be enacted by any nation" up to that time, Congress was soon persuaded that a more expansive approach was needed if the newly declared national policy of preserving endangered species was to be realized. By 1973, when Congress held hearings on what would later become the Endangered Species Act of 1973, it was informed that species were still being lost at the rate of about one per year, 1973 House Hearings 306 (statement of Stephen R. Seater, for Defenders of Wildlife), and "the pace of disappearance of species" appeared to be "accelerating." H.R.Rep.No.93–412, p. 4 (1973).  Moreover, Congress was also told that the primary cause of this trend was something other than the normal process of natural selection:
>
> "[M]an and his technology has [sic] continued at an ever-increasing rate to disrupt the natural ecosystem. This has resulted in a dramatic rise in the number and severity of the threats faced by the world's wildlife. The truth in this is apparent when one realizes that half of the recorded extinctions of mammals over the past 2,000 years have occurred in the most recent 50-year period." 1973 House Hearings 202 (statement of Assistant Secretary of the Interior).

Id. at 175-76.  "As it was finally passed, the Endangered Species Act of 1973 represented the most

comprehensive legislation for the preservation of endangered species ever enacted by any nation."

Id. at 180.

The ESA protects 3 categories of species: 1) endangered (in danger of extinction throughout

all or a significant portion of its range); 2) threatened (likely to become an endangered species

within the foreseeable future, and (3) an essential or experimental, nonessential ("ENE") population

(an endangered species or a threatened species outside of the current range of such species).  Animal

Welfare Inst. v. Martin, 588 F. Supp. 2d 70, 97-98 (D. Me. 2008) (citation omitted). "Endangered

species are entitled to the highest level of protection.  Threatened species 'are afforded fewer

protections than endangered species.'" Id. (internal citations omitted).  "Experimental populations

5

are treated similarly to threatened species with some defined exceptions." Id. at 98 n. 20 (citation omitted).

Once a species or subspecies is listed as endangered, the ESA prohibits "taking" the species. 16 U.S.C. § 1538(a)(1)(B) (*or referred to as ESA § 9*). The ESA defines "take" as: "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Although the ESA expressly prohibits taking an endangered species, the Act does not expressly prohibit taking a threatened species. Animal Welfare, 588 F. Supp. 2d at 98, n.21. However, the ESA allows the United States Fish and Wildlife Service ("FWS") to promulgate rules that "provide for the conservation" of threatened species. Id. (*citing* 16 U.S.C. § 1533(d)). With respect to experimental populations, the regulations provide that "[a]ny population determined by the Secretary to be an experimental population shall be treated as if it were listed as a threatened species for purposes of establishing protective regulations under section 4(d) of the Act with respect to such population." 50 C.F.R. § 17.82.

> USFWS has issued a blanket regulation that applies all prohibitions applicable to endangered species to threatened species, unless the agency has issued a special rule, a § 4(d) Rule, for a specific species. 50 C.F.R. § 17.31. Whether the distinction between endangered and threatened species allows for distinctions in regulation is the source of some controversy. *See* Sierra Club v. Clark, 755 F.2d 608, 612–19 (8th Cir. 1985). . . .

Animal Welfare, 588 F. Supp. 2d at 98, n.21.

In 1982, Congress amended the ESA to broaden the FWS's discretion to reintroduce endangered and threatened species into their historic ranges. Forest Guardians v. U.S. Fish and Wildlife Serv., 611 F.3d 692, 705 (10th Cir. 2010).

> In particular, Congress added section 10(j) to authorize the FWS to designate certain reintroduced populations of endangered and threatened species as "experimental populations." *See id.*; *see also* 16

> U.S.C. § 1539(j). An "experimental population" is "any population
> ... authorized by the Secretary for release ... but only when, and at
> such times as, the population is wholly separate geographically from
> nonexperimental populations of the same species." 16 U.S.C. §
> 1539(j)(1). "The Secretary may authorize the release ... of any
> population ... of an endangered species ... outside the current range
> of such species if the Secretary determines that such release will
> further the conservation of such species." Id. § 1539(j)(2)(A).

Id. This amendment intended to address FWS's and other affected agencies' frustration over

political opposition to reintroduction efforts perceived to conflict with human activity. Id. (citations

omitted). The amendment also attempted to provide the Secretary with a looser and more flexible

approach in promulgating regulations, without the strictures and unbending restrictions of ESA §

9. Defenders of Wildlife v. Tuggle, 607 F. Supp. 2d 1095, 1101, 1116 (D. Ariz. 2009). In other

words, the amendment allowed the Secretary more freedom to manage experimental populations.

> Although the Secretary already had authority to conserve a species by
> introducing it in areas outside its current range, Congress hoped the
> provisions of [§] 10(j) would mitigate industry's fears experimental
> populations would halt development projects, and, with the
> clarification of the legal responsibilities incumbent with the
> experimental populations, actually encourage private parties to host
> such populations on their lands.

Forest Guardians, 611 F.3d at 705 (citations omitted).

With respect to experimental populations, ESA § 10(j), or 16 U.S.C. § 1539(j), provides, in

part:

> (B) Before authorizing the release of any population under
> subparagraph (A), the Secretary shall by regulation identify the
> population and determine, on the basis of the best available
> information, whether or not such population is essential to the
> continued existence of an endangered species or a threatened species.
>
> (C) For the purposes of this chapter, each member of an experimental
> population shall be treated as a threatened species [with exceptions]
> . . . .

7

> (3) The Secretary, with respect to populations of endangered species or threatened species that the Secretary authorized, before October 13, 1982 [the date of the enactment of this subsection], for release in geographical areas separate from the other populations of such species, shall determine by regulation which of such populations are an experimental population for the purposes of this subsection and whether or not each is *essential to the continued existence of an endangered species or a threatened species*.

16 U.S.C. § 1539(j) ("Experimental populations") (emphasis added).  In <u>Wyo. Farm Bureau Fed'n</u>, 199 F.3d at 1232-33, the Tenth Circuit Court of Appeals explained:

> The purpose of requiring the Secretary to proceed by regulation, apart from ensuring that he will receive the benefit of public comment on such determinations, is to provide a vehicle for the development of special regulations for each experimental population that will address the particular needs of that population. Among the regulations that must be promulgated are regulations to provide for the identification of experimental populations. Such regulations may identify a population on the basis of location, migration pattern, or any other criteria that would provide notice as to which populations of endangered or threatened species are experimental.

Thus, Congress contemplated that the Secretary would promulgate special rules to identify an experimental population.  <u>Id.</u> at 1232.   The Secretary also could identify what experimental populations were "essential" or "nonessential" to the continued existence of an endangered or threatened species.  <u>Id.</u> at 1233.  Designation of a population as experimental and nonessential (*i.e.*, an ENE) increased the FWS's management flexibility.  63 Fed. Reg. 1752.

Pursuant to this Congressional grant of authority, that is exactly what occurred.  The FWS issued the Mexican Wolf Recovery Plan in 1982 for the reintroduction of the wolf in accordance with the special rule – "Final Rule for the Establishment of a Nonessential Experimental Population of the Mexican Gray Wolf in Arizona and New Mexico."  <u>Defenders of Wildlife, et al. v. United States Fish and Wildlife</u>, 797 F. Supp. 2d 949, 955 (D. Ariz. 2011).  Both the final rule and the

related final environmental impact statement envisioned "interagency cooperation in the implementation of the wolf reintroduction plan."  Id. (citations omitted).

### 50 C.F.R. § 17.84(k)[4]
*(or referred to as "special rule" or "special rules")*

Title 50 C.F.R. § 17.84(k) contains the special rules for regulation of the experimental population of the Mexican gray wolf.  The special rule establishes a larger Mexican Wolf Experimental Population Area ("MWEPA") that spans from the central western border of Arizona to the central eastern border of New Mexico.  50 C.F.R. 17.84(k)(9) (Fig. 3.)  The MWEPA includes two smaller recovery areas – the Blue Range Wolf Recovery Area (BRWRA), and, alternatively, if needed, the White Sands Wolf Recovery Area.  63 Fed. Reg. at 1753.  There are smaller "primary recovery zones" within the two larger recovery areas.

The purpose of the special rules is described in the following manner.

> The nonessential experimental [ENE] designation enabled USFWS to develop measures for management of the population that would be less restrictive than the mandatory prohibitions protecting species with "endangered status," including allowing limited "take" of individual wolves under narrowly defined circumstances.  This management flexibility was necessary to make reintroduction compatible with current and planned human activities, such as livestock grazing and hunting and was critical to obtaining needed State, Tribal, local, and private cooperation, which USFWS believed would improve the likelihood of success for the reintroduction plan.

Tuggle, 607 F. Supp. 2d at 1101 (citation omitted).  These special rules specifically allowed the Secretary to treat experimental populations differently and to authorize and develop measures not permitted for endangered or threatened species.  For example, the special rule provides an exception to the prohibition concerning the take of any wolf in the wild within the MWEPA.

---

[4]On January 12, 2008, the FWS issued a final rule pursuant to ESA § 10(j) that specified how the Mexican gray wolf would be designated and reintroduced.

The exception to prohibited takings is an "unavoidable and unintentional" taking of a wolf in the MWEPA. The special rule defines an "unavoidable and unintentional" taking as "accidental, unintentional take . . . which occurs despite reasonable care," provided that such taking is incidental to an otherwise lawful activity and not done on purpose. 50 C.F.R. § 17.84(k)(15) (definitions). The special rules related to experimental populations provides this example:

> Taking a wolf with a trap, snare, or other type of capture device within occupied wolf range (except as authorized in paragraph (k)(3)(ix) and (x) of this section) will not be considered unavoidable, accidental, or unintentional take, unless due care was exercised to avoid taking a wolf.

50 C.F.R. § 17.84(k)(15) (definition of "unavoidable and unintentional take"). Thus, if a trapper was careful or exercised due care in seeking to avoid capturing a wolf within a known wolf range, but nonetheless took a wolf, there would be no violation of law. The special rule clearly contemplates lawful trapping of animals in occupied wolf territory, provided the trapper meets certain requirements.

In addition, a motorist driving within the MWEPA at night and with due caution, might accidentally strike and kill a wolf when it suddenly and unexpectedly darts from a position of cover and crosses the road. If this take was unavoidable and accidental, there is no violation of the special rule.

In contrast, ESA § 9 prohibits any takes, whether they might be deemed unavoidable, unintentional, or otherwise. Under ESA § 9, an endangered species (not further categorized as an experimental population) may not be lawfully taken, harassed, harmed, shot, wounded, trapped or captured, regardless of the degree of care used. 16 U.S.C. § 1538(a)(1)(B); 16 U.S.C. § 1533(d). Thus, in the same scenario described, the attentive automobile driver, while lawfully operating a car at night and inadvertently striking an animal that is a listed species who crossed the road, would be

10

in violation of ESA § 9, even if the taking was entirely accidental and unintended. Similarly, under ESA § 9, regardless of the trapper's care to avoid taking a threatened or endangered species in a furbearer trap, there is a violation of that statute. In other words, there is no such exception for unavoidable or unintentional takings of a listed species under ESA § 9, and ESA § 9 does not contemplate lawful trapping of listed species that are not also designated experimental populations subject to special rules.

With respect to experimental populations, shooting a wolf would not be considered unavoidable or accidental. But, again, exceptions exist, *e.g.,* if a wolf is on private land, a livestock owner may take (including kill or injure) any wolf actually "engaged in the act of killing, wounding, or biting livestock, provided sufficient evidence of such action exists." 50 C.F.R. § 17.84(k)(3)(v). *See also* 50 C.F.R. § 17.84(k)(3)(vii) (on public lands, permits may issue to livestock owners for the taking of wolves that are engaged in the act of killing, wounding, or biting livestock, but permits will issue only upon a showing of certain requirements). Again, no such similar exceptions exist under ESA § 9.

In addition, it is noteworthy that the special rule states that FWS does not intend to change the ENE designation to essential experimental, threatened, or endangered and foresees no likely situation which would result in such changes. 50 CFR 17.84(k)(14).

**Motion to Dismiss/Cross Motions for Summary Judgment**

**I.      FED. R. CIV. P. 12(b)(6) LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, Guardians' complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Guardians' factual allegations in the complaint against Defendants "must be enough to raise a right

to relief above the speculative level." *See* <u>Christy Sports, LLC v. Deer Valley Resort Co.</u>, 555 F.3d 1188, 1191 (10th Cir. 2009).  With respect to the Rule 12(b)(6) motion, plausibility means that Guardians must plead facts which allow "the court to draw the reasonable inference that the defendants are liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Id.</u> at 663.

Guardians' complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," because "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" <u>Twombly</u>, 550 U.S. at 555 (internal quotations omitted).  "[A] plaintiff must 'nudge [ ][its] claims across the line from conceivable to plausible' in order to survive a motion to dismiss. . . . Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." <u>Ridge at Red Hawk, L.L.C. v. Schneider</u>, 493 F.3d 1174, 1177 (10th Cir. 2007) (internal citation omitted).

Stated differently, the Rule 12(b)(6) analysis requires two inquiries.  First, the Court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory.  <u>Iqbal</u>, 556 at 678.  Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." <u>Id.</u> at 680-81.  If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *See id.* at 682-83 .  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient.  <u>Id.</u> at 678.

**A.     Motion to Dismiss:**

Defendants set forth four arguments in support of their position that Guardians' complaint must be dismissed under Rule 12(b)(6): (1) failure to state a claim for a § 9 take violation of the ESA, 16 U.S.C. § 1538(a)(1)(B), because the statutory prohibition, on its face, applies only to endangered species rather than to experimental populations such as the Mexican gray wolves; (2) failure to state a claim for a violation of ESA § 10(j) special rule 50 C.F.R. § 17.84(k), because the due care standard applies only to the <u>activity</u> of trapping, rather than to the State's <u>regulation</u> and <u>licensing</u> of trapping for which Defendants are responsible; thus, Defendants could not have "caused" a take by regulating and permitting trapping. Moreover, if individual trappers did not exercise due care in their actions, the trappers broke the chain of causation thereby defeating any claim that Defendants caused takes by permitting trapping; (3) even if the due care standard applied to Defendants, the term is vague and unenforceable; and (4) Guardians did not provide appropriate and sufficient information regarding the purported violation and remedy in its ESA 60-day notice letter. [Doc. 19, at 1-2, Attachment 1.]

**B.     Discussion:**

**1.     <u>*Alleged § 9 Take Violation of ESA, 16 U.S.C. § 1538(a)(1)(B)*</u>**

Title 16 U.S.C. § 1538(a)(1)(B) (ESA § 9) prohibits taking any endangered species of wildlife listed under 16 U.S.C. § 1533, which sets forth regulations concerning the determination of endangered and threatened species. As noted above, the Mexican gray wolf is classified as an endangered species, but the population at issue in this litigation is an ENE (experimental, nonessential).

Guardians' complaint alleges that one of the ways that ESA § 9 promotes protection of individual animals is by its prohibition on taking and that the take prohibition applies to all listed

13

species, including those like the Mexican gray wolf that are reintroduced to the wild in accordance with ESA § 10(j). [Doc. 1, ¶ 16.] ESA § 9 renders it illegal for "any person" to take an endangered species.  According to Guardians, a take includes direct as well as indirect harm and need not be purposeful. [Doc. 1, at ¶ 14.]

Guardians notes that 50 C.F.R. § 17.31 expands the take prohibition to those species listed as threatened. [Doc. 1, at ¶ 12.] The ESA defines "any person" to include "any officer, employee, agent . . . " of any State, municipality, or political subdivision of a State," etc.  [Doc. 1, at ¶ 13.] Guardians further alleges that the ESA prohibits any person from *causing* the commission of an ESA violation. [Doc. 1, at ¶ 15] (*citing* 16 U.S.C. § 1538(g)) ("unlawful for any person . . . to attempt to commit, . . . or cause to be committed, any offense defined in this section.").  Guardians' complaint also sets out a number of decisions from various jurisdictions supporting the proposition that the ESA prohibits, not just the acts of those parties involved in direct takings, but also the acts of a third party that bring about a taking. [Doc. 1, at ¶ 15.]

Guardians' complaint discusses ESA § 10(j) and the special rule concerning the reintroduction into the wild of the Mexican gray wolf population and the classification of the population as an ENE.  Guardians alleges: "Although a [§] 10(j) Rule may narrow the [§] 9 prohibition on take, any alterations to an ENE population's ESA protections are meant only to encourage reintroduction and to secure the restoration of listed species to their native ecosystems." [Doc. 1, ¶ 18] (*citing* legislative history, etc.).  Guardians then states "[a]ny take of an individual belonging to an ENE population, which falls outside the scope of allowable take as set forth in the relevant [§] 10(j) Rule, is a violation of ESA § 9." [Doc. 1, ¶ 19.] In other words, Guardians alleges that whether viewed under ESA § 9 or § 10(j) and the special rule, Defendants caused unlawful takings of the Mexican gray wolves.

14

Defendants disagree, arguing that ESA § 9, on its face, applies only to endangered species, and not to experimental populations. [Doc. 19, at 11.] Defendants concede that the FWS extended the prohibitions in ESA § 9 to threatened species, *see* 50 C.F.R. § 17.31, but correctly observe that no such extension was made regarding ENEs or experimental populations. [Doc. 19, at 11.] Instead, the FWS's special rule prohibitions provide that the experimental populations will be treated as if they were listed as a threatened species for purposes of establishing protective regulations under § 4(d) of the ESA. 50 C.F.R. § 17.82. Thus, according to Defendants, the complaint fails to state a claim with respect to an alleged violation of 16 U.S.C. § 1538(a)(1)(B), because that section, on its face, applies only to endangered species, but not to experimental populations.

The Court acknowledges Guardians' arguments in response. For example, Guardians contends that Defendants' "position is premised on the sophism that an ENE designation somehow strips the population of an otherwise listed species of its ESA protections." [Doc. 33, at 5.] Guardians further argues that "[i]n essence, Defendants want this Court to believe that an ENE designation works as a *de facto* delisting of a reintroduced population." [Id.]

Relying on 16 U.S.C. § 1539(j)(1)(C), Guardians asserts that the "effect of an ENE designation is that members of that population are 'treated' as threatened species." However, in examining § 1539(j)(1)(C), that provision provides that "each member of an experimental population shall be treated as a threatened species . . . .," with exceptions. The statute does not expressly state that ENEs must be treated as threatened species; indeed, the exceptions indicate the contrary. *See* 16 U.S.C. § 1539(j)(1)(C)(i) (each member of experimental population to be treated as a threatened species except that an experimental population determined to be nonessential shall be treated as a species proposed to be listed.) Acceptance of Guardians' argument would, of necessity,

nullify the exceptions under the special rules, 50 C.F.R. § 17.84(k) because the Guardians' analysis leaves no room for any exception like an unintentional and accidental take.

The Court also reviewed Guardians' position that the regulations provide that any population determined to be experimental "shall be treated as if it were listed as a threatened species for purposes of establishing protective regulations under section 4(d) of the Act."  50 C.F.R. § 17.82.  However, that CFR provision does not discuss whether the population at issue is classified as essential or nonessential.

Section 4(d) of the ESA, 16 U.S.C. § 1533(d), provides that the Secretary of Interior must issue regulations "as he deems necessary and advisable to provide for the conservation" of a species listed as threatened.  "The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under § 1538(a)(1). . . ." 16 U.S.C. § 1533(d).  In addition, as noted by Guardians, the ESA § 9 take prohibition is extended to all threatened species. [Doc. 33, at 6] (*citing* 50 C.F.R. §§ 17.21, 17.31).  But, none of this language expressly provides that the ESA § 9 protection against taking extends to ENE populations.

Indeed, the intent of the special rule was to provide the Secretary with more flexibility so that he or she was not as rigidly constrained in the management of experimental populations.  The entire purpose of an experimental population designation is to allow the Secretary some leeway and authority to "experiment" in the management, preservation and conservation of a species.  Moreover, the Tenth Circuit instructs that when considering language employed by Congress, "we read the words of the statute in their context and with a view to their place in the overall statutory scheme" and thereby "ordinarily resist reading words or elements into a statute that do not appear on its face."  United States v. Sturm, 673 F.3d 1274, 1279 (10th Cir.), *cert. denied*, 133 S.Ct. 300 (2012).  Guardians' argument would compel the Court to conclude that useless language was

16

inserted into the C.F.R.'s special rules.  This, the Court cannot do.  The Court presumes that when

an agency promulgates a rule, just as when a legislature enacts a law, it knows what it is doing, and

is presumed not to have engaged in a useless act.  *See* <u>In re Mueller</u>, 867 F.2d 568, 570 (10th Cir.

1989) (noting presumption that a legislature does not intend to enact useless or meaningless statutes)

(citation omitted).  Additionally, a rule of construction requires a court to consider regulations and

statutes *in pari materia.*"[5]  If changes or repairs to the statutory language are appropriate, Congress

can make those modifications or amendments.

In addition, as noted by Defendants, Guardians selectively quotes from the ESA and the

FWS regulations. [Doc. 48, at 5.]  Guardians ignored 50 C.F.R. § 17.82, a regulation "expressly

addressing prohibitions for *experimental populations*, and thereby failed to note that such

populations are treated by the FWS as 'threatened' *only* ' for purposes of establishing protective

regulations' under Section 4(d) of the ESA." [<u>Id.</u>] (emphasis in original).  In other words, the statutes

and regulations indicate that the experimental populations, while *treated* as threatened for some

purposes, do not amount to *actual* threatened populations which would receive the broader

protections of 50 C.F.R. § 17.31, including the prohibition against takings under the ESA § 9.

Again, the Tenth Circuit instructs that an agency's regulations are applied as written.  Thus, the

Secretary may rightfully treat experimental populations as threatened for some purposes, but is not

compelled to treat them as threatened in every regard.  *See* <u>McConnell v. Dir., Office of Workers'</u>

---

[5] *"In pari materia"* means "in the same matter."  <u>Black's Law Dictionary</u>, p. 797 (7th Ed. 1999).
A court, as a "canon of construction," (<u>id.</u>), must view related statutes [or regulations] on the same subject
together, and thereby avoid inconsistencies.  Therefore, the Court may not look at the regulations in
isolation but must consider the regulations "*in pari materia*" with other related regulations.  In doing so,
the Court construes the framer's intent as a whole, and does not interpret one regulation without
consideration of another.  In applying the *"in pari materia"* approach, as required by law, the Court
cannot disregard the Secretary's right to make exceptions or to adopt experimental approaches consistent
with the overall goal of species management.

Comp. Programs, 993 F.2d 1454, 1462 n.11 (10th Cir. 1993) (noting that when an interpretation lacks support in the language of a regulation, even if the agency's interpretation might be wise, "that wisdom belongs in the Code of Federal Regulations.")

The Court carefully considered this complex array of regulations and statutory provisions, along with the parties' arguments regarding how the ESA and the pertinent special rules may interact, overlap, and apply.  The Court agrees with Defendants' first position – that the ESA § 9 protections, on their face, apply only to endangered species, but not to experimental populations. ESA § 4(d) requires the Secretary to promulgate "protective regulations" "as he deems necessary and advisable to provide for the conservation of such species," 16 U.S.C. § 1533(d); thus, the Secretary had the authority to apply the ESA § 9 take provision to experimental populations, but he did not do so and none of the statutory language, on its face, indicates otherwise.

While the ESA § 9 take provision applies only to endangered species, it is true that the FWS, through regulations, extended protections to threatened populations.  50 C.F.R. § 17.31.  However, nothing in § 17.31 mentions experimental or ENE populations.  Clearly, the FWS knows how to provide protections by drafting regulations.  Had FWS wanted to extend the 50 C.F.R. § 17.31 protections to experimental populations it would have done so explicitly, just as it did with threatened species.  Protection against takings exists to the extent it was granted or extended to certain populations.  If not granted by statute or regulation, the protection does not exist.  Therefore, contrary to Guardians' argument, there is no existing protection for the ENE that could be "stripped." [*See* Doc. 33, at 5.]

Moreover, 16 U.S.C. § 1539(j)(1)(C)(i) makes clear that while each member of an experimental population is to be treated as a threatened species, the same is not true for an experimental, nonessential population.  In addition, the special rules state that the FWS "does not

18

intend to change the 'nonessential experimental' designation [of the Mexican gray wolf] to 'essential experimental,' 'threatened,' or 'endangered' and foresees no likely situation which would result in such changes." 50 C.F.R. § 17.84(k)(14).  Guardians' argument, if accepted, would result in an *ipso facto*" change of designation for the Mexican gray wolf from an experimental, nonessential population to an experimental essential population.

The Court accepted as true all well-pleaded factual allegations in the complaint and viewed them in the light most favorable to Guardians, *see* Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009), *cert. denied*, 130 S.Ct. 1142 (2010); however, the Court concludes that Guardians' allegations of an ESA § 9 take violation are insufficient, as a matter of law, "to raise a right to relief above the speculative level."  The pertinent statutes and regulatory language, on their face, do not support the allegations.  In other words, Guardians failed to nudge its "claims across the line from conceivable to plausible" sufficient to survive Defendants' motion to dismiss.  *See, e.g.*, Commonwealth Prop. Advocates, LLC v. Mortgage Elec. Registration Sys, Inc., 680 F.3d 1194, 1201-02 (10th Cir. 2011) (discussing cases in which courts observed that dismissal is appropriate if the law simply affords no relief).

### 2.    *Alleged Violations of ESA § 10(j) Special Rule*

ESA § 10(j) or the special rule pertaining to the Mexican gray wolf provides that "[n]o person, agency, or organization may 'take' [see definition in paragraph (k)(5) of this section] any wolf in the wild within the MWEPA, except as provided in this rule."  50 C.F.R. § 17.84(k)(3). The regulations further provide that "you will not be in violation of the Act or this rule for 'unavoidable and unintentional take' . . . of a wolf."  50 C.F.R. § 17.84(k)(3)(i).

Guardians' complaint alleges that the "§ 10(j) rule alters the § 9 take prohibition to provide only narrow exceptions for legalized take." [Doc. 1, ¶ 23.]  The pertinent definition or exception provides as follows:

> *Unavoidable and unintentional* take means accidental, unintentional take . . . which occurs despite reasonable care, is incidental to an otherwise lawful activity, and is not done on purpose.  . . . Taking a wolf with a trap, snare, or other type of capture device within occupied wolf range  .  .  .  will not be considered unavoidable, accidental, or unintentional take, **unless due care was exercised to avoid taking a wolf**.

50 U.S.C. § 17.84(k)(15)("definitions") (emphasis added).

According to Guardians, "[b]etween March 2002 and February 2009, 14 individual wolves were captured 15 times in foothold traps set by persons other than Project personnel."  Most of the wolves that were trapped were within the BRWRA. [Doc. 1, ¶ 25a-m.] Guardians alleges that since 1998, when the Mexican gray wolf recovery project began, the New Mexico Department of Game and Fish has sold 21,734 resident trapping licenses and 313 non-resident trapping licenses that allow individuals to place various types of traps in New Mexico, including the MWEPA, in order to capture "furbearers."[6]  [Doc. 1, ¶ 27.] While the traps are set in accordance with existing regulations that contemplate the trapping of animals other than the Mexican gray wolf, the traps have the capacity to take a Mexican gray wolf, or other protected furbearer such as pine marten, river otter, black-footed ferret, and coatimundi.  Because neither Defendant agency provides regulations that require a licensed trapper to take any special measure to avoid capturing a wolf in one of the traps, Guardians asserts that Defendants failed to exercise the required due care to avoid the taking of wolves. [Doc. 1, ¶ 28.] Guardians contends that New Mexico's trapping regulations are completely

---

[6]Trapping of furbearers is legal in New Mexico, subject to licensing rules and regulations.  *See* §§ 17-5-1 to 17-5-9 NMSA 1978.

silent on this issue, thereby confirming that Defendants failed to exercise any due care. [Doc. 1, ¶ 28.]

In their motion to dismiss, Defendants argue there is no requirement that they exercise due care because, on its face, the special rule's definition of "unintentional and unavoidable take" uses the due care standard only with respect to the *"act of trapping."* [Doc. 19, at 11-12 (*citing* 50 C.F.R. § 17.84(k)(15).)  In other words, Defendants assert that the agencies themselves did not engage in the act of trapping, and that the special rule cannot apply to Defendants' regulatory, licensing actions in connection with trapping.  In addition, Defendants contend that even if a violation of 50 C.F.R. § 17.84(k)(15) could occur, the agencies cannot be held liable for the alleged trappings of Mexican gray wolves by third parties, as Defendants did not actually trap the wolves.  Thus, the due care standard does not apply to Defendant agencies. [Doc. 19, at 12.]

Defendants further state that FWS could not have meant to impose a due care standard on a state's regulation of a take because Congress intended to give FWS more management flexibility to impose more lenient take regulations in order to ease the burden on New Mexico, Arizona, and Texas, and to encourage their cooperation in the reintroduction of the Mexican gray wolf into the wild.  Thus, Defendants argue that Guardians incorrectly interprets the special rules to require state agencies to exercise an undefined due care standard on the agencies' promulgation and enforcement of regulations, contrary to the intent of ESA § 10(j).  According to Defendants, Guardians' construction of the special rule to impose a due care regulatory requirement on the state is "plainly wrong as a matter of law," requiring dismissal of the complaint.

Defendants acknowledge Guardians' reliance on a line of decisions holding government entities liable for an indirect violation of the ESA where such entities "caused" a take of an endangered or threatened species through government action or inaction.  However, Defendants

argue that all of the cited cases are distinguishable because they concerned endangered or threatened animals rather than ENE or experimental populations. [Id. at 13-14.]

In addition, Defendants contend they cannot be held liable under any scenario and that it is the "FWS's own allowance of trapping in the special rule and/or the failure of individual trappers to abide by the FWS's due care standard that may cause improper takes." [Id. at 15-16.] For example, if individual trappers acted without due care, these third parties' failure to exercise due care constitutes an independent, intervening factor in any alleged taking, for which Defendants cannot be held accountable.

Guardians characterizes Defendants' position as resting "on the notion by inserting the term 'due care' into the Mexican wolf take prohibitions, FWS has foreclosed the possibility of third party liability." [Doc. 33, at 12.] Guardians argues such argument "runs counter to the language of the Mexican Wolf Rule, well-established ESA § 9 jurisprudence, and the very purpose of the ESA." [Id.]

Specifically, Guardians contends that 16 U.S.C. § 1538(g) of the ESA expressly contemplates third party liability for a take by making it unlawful for any person to cause to be committed any offense defined in § 9. Similarly, the special rule provides that "[y]ou must not . . . cause to be commited[] any offense defined by [the Mexican Wolf Rule]." Guardians asserts that ESA § 9 and the special rule are "in fact similar iterations of the same offense" that both prohibit a take in the same way. [Id.]

Guardians further explains that the take prohibitions are different because it would be pointless to require FWS to craft an ENE take prohibition in the special rule that is identical to that of ESA § 9. According to Guardians, the difference is in scope, not in kind. "ESA § 9 prohibits the take of endangered species by trapping generally regardless of the degree of care used, while the

Mexican Wolf Rule ("special rule") prohibits the take of wolves by trapping in occupied wolf range absent due care." [Id., at 13.] Thus, Guardians posits that other courts' interpretations and applications of the ESA § 9 take prohibition is informative in cases involving the application of the special rule take prohibition.

Guardians specifically contends that Defendant Lane is responsible for issuing "furbearer"[7] trapping licenses. No person may set a trap for a furbearer within New Mexico without first obtaining a license. Thus, the issuance of a license by the State is the "but for cause" of unlawful wolf takes exacted via furbearer trapping. For purposes of causation, Guardians argues it makes no difference that individuals with licenses, as opposed to the State agency itself, set the traps. [Id., at 15.] In support of this argument, Guardians cites to Animal Prot. Inst. ("API") and Ctr. for Biological Diversity v. Holsten, 541 F. Supp. 2d 1073, 1081 (D. Minn. 2008).

> Rather than prohibit trapping altogether, Minnesota has allowed trapping activities within its borders. In order to legally engage in trapping in Minnesota, however, one must obtain a license and follow all governmental regulations governing trapping activities. Thus, for purposes of determining proximate cause, the DNR's licensure and regulation of trapping is the "stimulus" for the trappers' conduct that results in incidental takings. Accordingly, the trappers' conduct is not an independent intervening cause that breaks the chain of causation between the DNR and the incidental taking of lynx.

[Id., at 16] (citing API, 541 F. Supp. 2d at 1079). Guardians asserts that similar to the API facts, Defendant Lane does not require any licensed trapper to take any measure to avoid capturing a wolf in any type of trap set for a furbearer within the MWEPA, and therefore, failed to exercise due care in violation of the special rule.

---

[7]Neither coyotes nor skunks are considered furbearing animals under New Mexico law. § 17-5-2 NMSA 1978. According to Guardians, this means that coyote and skunk trapping is lawful, although such trapping is completely unregulated within New Mexico. [Doc. 33, at 16.]

In addition, Guardians alleges that Defendant McClintic is responsible for promulgating trapping regulations.  Currently, those laws pertain only to furbearer trapping and do not require that any licensed trapper take any measure to avoid capturing a wolf in any trap type set for a furbearer. [Id.] Because Defendant McClintic does not require any coyote or skunk trapper to take measures to avoid capturing a wolf in a trap set for a coyote or skunk, his omissions cause the unlawful taking of wolves in occupied wolf range.  Guardians further asserts that the ESA, the special rule, and the New Mexico Wildlife Conservation Act obligate the State Game Commission to avoid trapping wolves. [Id., at 17.] Stated differently, by failing to regulate trapping so as to require any licensed or unlicensed trapper to take measures to avoid capturing a wolf in the MWEPA, with traps set for furbearers, Defendant McClintic failed to exercise due care in accordance with the special rule.

In their reply, Defendants argue that Guardians' allegations are no more than "a formulaic recitation of th elements of a cause of action," and that, as a result, the complaint cannot withstand Rule 12(b)(6) scrutiny. [Doc. 48, at 8.] Defendants also contend that Guardians' arguments are flawed and that its reliance on ESA § 9 cases is inapposite.  Defendants continue to posit that Guardians failed to allege a single Mexican gray wolf was trapped without the trapper's use of due care and further failed to allege a take under the special rule.  Accordingly, Defendants could not have caused a take. [Id., at 10.]

In addition, Defendants assert that even if Guardians' complaint alleges a take under the special rule, the "but for" causation argument fails because the complaint fails to allege a single instance in which a Mexican gray wolf was caught in a trap set for a furbearer.  Defendants further contend that Guardians' position would require Defendants to take "unspecified" measures to avoid capturing a wolf that would amount to the promulgation of redundant regulations.  Moreover, Defendant McClintic has no authority to regulate trapping of coyotes and skunks in order to protect

wolves [Id., at 11], because no license is required by the State of New Mexico, and there are no trapping seasons for these species.

Under the special rule, an agency can be held liable for an unlawful take, if the agency engaged in the activity of taking a wolf.  50 C.F.R. § 17.84(k)(3).  For example, that section of the regulations refers to the definition of a take, 50 C.F.R. § 17.84(k)(15)(definitions).  All of the definitions of a take include activities of harassing, harming, pursuing, hunting, wounding, killing, trapping, capturing, rather than regulation of such activities.  Under the definition of "unavoidable and unintentional takes," again the examples listed relate to the activities of striking, catching, trapping, or shooting a wolf, but not to the failure to instigate certain regulations that might be more protective.  The Court determines that, on its face, the special rule does not apply to the regulation or non-regulation of trapping, or to the promulgation or enforcement of New Mexico's state trapping regulations.  Therefore, Guardians' complaint against Defendants fails to state claim as to violations of the special rule.

In addition, Guardians' allegations that Defendants failed to exercise due care as required by the special rules similarly fail to state a claim.  The pertinent regulation, on its face imposes a requirement of due care or reasonable care on the act of trapping, taking, or striking a Mexican gray wolf, but not on the regulation or licensing of trapping.  50 C.F.R. § 17.84(k)(15) (definition of "unavoidable and unintentional take").  The complaint does not allege that these Defendants actually trapped any Mexican gray wolves, and at most, is speculative as to whether Defendants could have caused any takes.  The allegations that Defendants did not exercise due care by their failure to promulgate additional trapping regulations that might avoid taking a wolf are insufficient to raise a right to relief above the speculative level, and therefore, fail to state a claim for relief.

Even if Defendants could be said to have indirectly participated in the take of a Mexican gray wolf by their regulatory actions alone, the complaint fails, on its face, to demonstrate Defendants "caused" an unlawful take.  Assuming for the sake of argument that Defendants could have promulgated more restrictive trapping regulations and licensing requirements and that trappers did not adhere to those regulations and requirements, Defendant state agencies, as a matter of law, did not cause any such takes.  In that scenario, Defendants merely permitted trapping where third party hunters or trappers engaged in unlawful and intervening activities that would break the chain of causation with respect to Defendants.

Guardians asserts that the ESA expressly contemplates third party liability for a take by relying on 16 U.S.C. § 1538(g).  Yet, that provision expressly states only that "it is unlawful for any person" (including an agency by definition) to "cause to be committed" a take.  It does not expressly discuss third party liability.  *But see* United States v. Town of Plymouth, Mass., 6 F. Supp. 2d 81, 90 (D. Mass. 1998) (noting that the ESA's prohibitions contemplate both the actions of individuals who directly take a species and those of a third party authorized by the government to engage in activity resulting in a taking) (*citing* 16 U.S.C. § 1538(g).)  Guardians similarly contends that the special rule expressly contemplates third party liability when it provides that "[y]ou must not attempt to commit, solicit another to commit, or cause to be committed, any offense defined in this rule."  50 C.F.R. § 17.84(k)(5).  The special rule does not expressly mention third party liability particularly in the context of regulating or licensing trapping activities.

Guardians insists that "numerous courts across the country" have imposed third party liability for governmental action or inaction "shown to bring about a taking." [Doc. 33, at 14.] The Court reviewed each of the cited cases and finds them distinguishable.  Had any of the cases dealt with an experimental, nonessential population, for which special rules were developed, Guardians'

argument might be more persuasive.  However, Guardians did not identify a single case were ESA third party liability was applied for a claimed taking of an experimental, nonessential species.  All of the cases relied upon involve endangered or threatened species.  In <u>Defenders of Wildlife v. Adm'r, E.P.A.</u>, 882 F.2d 1294, 1301 (8th Cir. 1989), Guardians argue that the EPA could be held liable for a take that was associated with the agency's registration of strychnine, which was later applied by third parties.  In that case, the record showed that the <u>endangered</u> species at issue ate the strychnine bait, and as a result, either directly or indirectly, died.  But, as noted, that case involved an endangered species, not an ENE, nor was there discussion of a due care standard as applied under a special rule.        In <u>Strahan v. Coxe</u>, 127 F.3d 155, 163 (1st Cir. 1997), *cert. denied,* 525 U.S. 830 (1998), the court found that a Massachusetts state agency could be liable for a take under the ESA by licensing gillnet and lobster pot fishing, in which endangered Northern right whales were likely to become entangled.  The reasoning and holding in <u>Strahan</u> are somewhat supportive of Guardians' position in this case.  However, again, the key distinction is that all of the cases cited by Guardians, including <u>Strahan</u>, involved endangered and threatened species along with the definition of a take in that context rather than in relation to an ENE, where the Secretary's authority was intended to be less rigid and more flexible to allow for the better management of the experimental, nonessential populations.

Here, the pertinent special rule contemplates taking or trapping a Mexican gray wolf, provided the trapper acted with due care to avoid the trapping.  None of the cited cases address this issue or a similar special rule.  *See, e.g.,* <u>Sierra Club v. Lyng</u>, 694 F. Supp. 1260 (E.D.Tex. 1988), *aff'd by,* <u>Sierra Club v. Yeutter</u>, 926 F.2d 429 (5th Cir. 1991) (plaintiffs argued that Forest Service's silvicultural practices and methods of managing Texas national forests resulted in a taking of the red-cockaded woodpecker, an endangered species); <u>Babbitt v. Sweet Home Chapter of Comm. for</u>

a Great Oregon, 515 U.S. 687, 690-92, 704 (1995) (finding that third party liability may be imposed for governmental inaction that brings about a take but discussion limited to endangered or threatened species); Loggerhead Turtle v. County Council of Volusia County, Fla., 896 F. Supp. 1170 (M.D.Fla. 1995) (turtles were endangered or threatened; court did not address alleged taking of an ENE); Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc., 23 F.3d 1508 (9th Cir. 1994) (discussing taking of grizzly bears, a threatened species); API, 541 F. Supp. 2d at 1081 (holding that Minnesota agency was liable for § 9 taking by authorizing and snaring within range of the threatened Canada lynx).

The Court concludes that Guardians' allegations that Defendants indirectly or directly caused a taking of the ENE fail to state a claim under Rule 12(b)(6).  Nothing in the special rules requires a state agency, through its regulatory or licensing obligations, to exercise reasonable or due care in the taking of Mexican gray wolves which are part of an ENE population.

Title 50 C.F.R. § 17.84(k)(15) (definitions) utilizes that terminology solely with respect to "unavoidable and unintentional takes."  All of the examples under that definition refer to active taking of wolves, rather than regulatory or licensing actions by agencies.  With respect to the exercise of due care or but for causation, Guardians' failed to plead facts that would allow "the court to draw the reasonable inference that the defendants are liable for the misconduct alleged."  Therefore, the complaint fails to state a claim with respect to an alleged violation of the special rule.[8]

---

[8]Based on the clear statutory and regulatory language, it seems unlikely that Guardians could amend their complaint to state a claim.  However, even if it could, the Court proceeds to the summary judgment analysis and additionally finds that summary judgment in favor of Defendants is appropriate; thus a dismissal, without prejudice, is inappropriate.

Because of this determination, the Court does not reach Defendants' additional arguments that "due care is a vague and unenforceable term" or that there was insufficient information in the ESA 60-day notice letter.

## II.     FED. R. CIV. P. 56 SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is not a "disfavored procedural shortcut."  Rather, it is an important procedure designed to "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995).  The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case and the moving party is entitled to judgment as a matter of law.  Celotex Corp., 477 U.S. at 325.

The factual record along with any reasonable inferences that may be drawn therefrom must be examined in the light most favorable to the party opposing summary judgment.  Spaulding v. United Transp. Union, 279 F.3d 901, 904 (10th Cir.), cert. denied, 537 U.S. 816 (2002).  Once the moving party meets its burden, the party opposing the motion must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986); Biester v. Midwest Health Servs, Inc., 77 F.3d 1264, 1266 (10th Cir. 1996).  The party opposing the motion may not rest upon the mere denials of his pleadings to avoid summary judgment.  Fed. R. Civ. P.

56(e);  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  Rather, the

nonmoving party must "set forth specific facts that would be admissible in evidence in the event of

trial from which a rational trier of fact could find for the nonmovant."  Mitchell v. City of Moore,

Okla., 218 F.3d 1190, 1197-98 (10th Cir. 2000) (internal citation omitted).

Here, where the parties filed cross motions for summary judgment, "[the court is] entitled

to assume that no evidence needs to be considered other than that filed by the parties, but summary

judgment is nevertheless inappropriate if disputes remain as to material facts."  James Barlow

Family Ltd. Partnership v. David M. Munson, Inc., 132 F.3d 1316, 1319 (10th Cir. 1997), cert.

denied, 523 U.S. 1048 (1988).  Therefore, the legal standard remains the same – each party has the

burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a

matter of law.  Atlantic Richfield Co. v. Farm Credit Bank, 226 F.3d 1138, 1148 (10th Cir. 2000).

In other words, cross motions are evaluated independently.  The denial of one does not require the

grant of another.  US Airways, Inc. v. O'Donnell, 627 F.3d 1318, 1324 (10th Cir. 2010) (quotation

and ellipsis omitted).

A.     Cross Motions for Summary Judgment:[9]

As noted above, Guardians, Defendants, and Defendant Intervenors filed cross motions for

summary judgment. Guardians asserts that the undisputed material facts demonstrate that the federal

government documented 13 instances of wolf trapping in New Mexico (at least ten of which were

within "occupied Mexican wolf range") and that neither Defendant exercised due care to avoid

additional captures of the wolves.  These trappings occurred between March 2002 and February

---

[9]The Court does not address each argument raised by the parties, intervenors or amicus curiae, but, instead, discusses the most persuasive arguments based on the undisputed material facts.  For example, the Court does not address or make a determination as to location of the trapped wolves in New Mexico and whether they were trapped in "occupied wolf range."

2009.  Some of the wolves were killed or injured, but the evidence shows that not all of these trappings physically injured the wolves.  According to Guardians, and as discussed above, Defendants' actions or inaction in their regulatory or licencing responsibilities violated ESA § 9 and the special rule's taking restrictions or exceptions.

Specifically, Guardians asserts Defendant Lane violated ESA § 9 by issuing trapping licenses to persons, who, upon setting traps for furbearers, actually caught endangered wolves. [Doc. 11, at 16.] Defendant McClintic allegedly violated ESA § 9 by failing to regulate trapping in a way that avoids the capture of wolves.  Guardians contends that the special rule does not cure the Defendants' alleged violations because neither Defendant exercised due care to avoid taking wolves.

Defendants' cross motion for summary judgment presents similar arguments to those raised in their motion to dismiss, *e.g.,* Defendants could not have violated ESA § 9 because that statutory provision does not apply to the experimental, nonessential population of Mexican gray wolves; and that they could not have caused a take under the special rule because Defendants were not engaged in any actual trapping activities.  Thus, with respect to an alleged violation of the special rule, Guardians cannot show that Defendants failed to exercise due care.  According to Defendants, even if their regulations or failure to regulate certain trapping activities were considered a take under the special rule, a trapper who actually takes a Mexican gray wolf without the use of due care is an intervening cause that breaks the chain of causation with respect to Defendants.

Defendants include an additional argument as to why Guardians is not entitled to relief on its request for injunctive relief, *i.e.,* that Plaintiff's request for injunctive relief exceeds the bounds of the requirements of the special rule.  Put differently, Defendants assert that Guardians' request seeks a federal court order requiring state agencies to regulate beyond that which the special  rule requires.  Thus, if Guardians' request for injunctive relief succeeded, a federal court's order would

31

have the power of requiring state officials to comply with federal law in violation of the Tenth Amendment of the United States.

**B.      Background:**

In order to better understand the arguments and issues at hand, the Court summarizes some of Guardians' attached exhibits and argument.  Guardians states that Mexican gray wolves currently exist in the wild only where they have been reintroduced, *i.e.,* MWEPA (larger area) and BRWRA (within MWEPA).  According to Guardians, despite 14 years of active reintroduction, FWS has yet to reestablish a wild wolf population reaching 100 individuals. [Doc. 11, at 9-10.]

Guardians cites to a U.S. Geological Survey Open-File Report 2011-1190 ("report"), "Evaluating Trapping Techniques to Reduce Potential for Injury to Mexican Wolves," authored by Trey T. Turnbull and Gary W. Roemer (Dep't of Fish, Wildlife, and Conservation Ecology at NM State University) and James W. Cain III (U.S. Geological Survey, NM Cooperative Fish and Wildlife Research Unit, Dep't of Fish, Wildlife, and Conservation Ecology, NM State University). In the article's abstract, the authors note that former Government Bill Richardson issued an executive order prohibiting trapping in the New Mexico portion of the BRWRA.  Such ban was to last six months and required an evaluation of the risk posed to wolves by traps and snares legally permitted in New Mexico.  The authors reviewed various threats to wolves in the BRWRA, including threats posed by regulated furbearer trapping.  The authors wrote:

> Seventy-eight Mexican wolf mortalities were documented during the reintroduction effort (1998-2010).  More than 80 percent Mexican wolf mortalities were human-caused: illegal shooting (47.4 percent), vehicle collisions (15.4 percent), lethal removal by the U.S. Fish and Wildlife Service (USFWS) (14.1 percent), nonproject-related trapping (2.6 percent), project-related trapping (1.3 percent), and legal shooting by the public (1.3 percent).  The remaining 17.9 percent of mortalities were a result of natural causes.  An additional 23 wolves were permanently removed from the wild by USFWS.  Of

32

> 13 trapping incidents in New Mexico that involved trappers other than USFWS project personnel, 7 incidents resulted in injuries to wolves, 2 wolves sustained injuries severe enough to result in leg amputations, and 2 wolves died as a result of injuries sustained. Rubber-padded foothold traps and properly set snares would most likely reduce trap-related injuries in to Mexican wolves; however, impacts caused by trapping are outnumbered by other, human-caused impacts.

[Doc. 11-3.] According to Guardians, the article or report did not result in amendment of the trapping regulations. Instead, the Commission lifted the trapping ban in July 2011, upon recommendation of New Mexico's Department of Game and Fish. [Doc. 11, at 15.]

The New Mexico Department of Game and Fish issued the 2012-2013 Big Game and Furbearer Rules and Information. [Doc. 11, Ex. 6.] The regulations regarding "Trapping and Mexican Gray Wolves" provide that "[t]rapping has not been shown to negatively impact Mexican Gray Wolf populations." [Id., Ex. 6, at 57.] However, the New Mexico Game and Fish Department sets forth a number of recommendations and restrictions. It recommends that trappers use certain techniques to reduce the potential for injury to inadvertently trapped Mexican gray wolves, *e.g.,* double staking of traps, short chains to prevent lunging or rolling-induced injury, use of chains or cables if using drags to hasten recovery and safe release of animal, and use of laminated off-set or padded jaws on foot-hold traps. If wolves are spotted in an area where an individual intends to trap, the trapper should avoid the area if possible. The licensing requirements provide that "[t]rappers will be held criminally liable if they accidentally capture a Mexican Gray Wolf." The requirements inform the potential trapper that shooting a wolf could result in jail time of up to a year and as much as $50,000 in monetary fines. The licensing requirements also mandate visual inspection of traps on a daily basis; release devices or catch poles must be carried by the trapper to release animals; traps must contain the trapper's name, address, and trapper identification number. There are

limitations on the kind and size of traps used, where traps may be set, and use of baiting traps. [Id., Ex. 6, at 57-58.] Release of unintentionally trapped animals is required, and if a wolf is accidentally trapped and injured, the Department of Game and Fish is to be summoned so as to treat the injured animal.

Defendants claim the USGS report is inadmissible hearsay, contains discrepancies, and is untrustworthy for several reasons. They also assert that Guardians omitted material information from the report.

The Court's reference to the report does not mean that it would be admissible at a trial, nor does the Court deem all such information from the report to be material or uncontested. The Court provides some of the information in terms of material undisputed facts (*see infra*), but summarized other information from the report for background purposes only.

## C.    Undisputed Material Facts:

The Court does not repeat here all of the same facts and discussion of those facts that it set out at length above in the sections, "Mexican Gray Wolf," "Endangered Species Act" ("ESA"), and 50 C.F.R. § 17.84(k). However, the Court finds those sections contain material, undisputed provisions of law and regulations pertinent to the cross motions. (*See* discussion *supra*.) The Court refers to the language in some of these sections and sets forth other undisputed, material facts below.[10]

---

[10]At times, both Guardians and Defendants argue that each other's statements of material facts contain contested interpretations of law. To the extent that the Court also provides interpretations of law and regulations, the Court supported those interpretations with case law that the Court found either binding or persuasive. The Court deems its statement of material facts, notwithstanding interpretations of statutes and regulations, to be undisputed.

The ESA protects three categories of species: endangered, threatened, and essential or experimental, nonessential (ENE) populations.  The Secretary of the Interior, acting through the FWS, may list and subsequently protect threatened and endangered species.

In 1976, the Mexican gray wolf was listed as an endangered subspecies.  Once a species or subspecies is listed as endangered, the ESA § 9 prohibits taking that species, as discussed in detail above.  Under FWS regulations, threatened species generally are subject to the same prohibitions as endangered species.

In 1982, Congress added § 10(j) to the ESA "to address federal agencies' frustration over political opposition to reintroduction efforts being taken under ESA provisions that protect a species once it is listed as endangered or threatened."  Defenders of Wildlife, 797 F. Supp. 2d at 954.  The purpose of § 10(j) was to mitigate "perceived conflicts with human activity from reintroduction of endangered or threatened species by clarifying and limiting ESA responsibilities incumbent with experimental populations in the hope of encouraging private parties to host experimental populations like the Mexican wolf."

Essentially, ESA § 10(j) provides for classifying listed species as experimental populations, that are then subject to different prohibitions, exceptions to prohibitions, and levels of protection in contrast with the prohibitions for listed animals that are not classified as experimental populations.  Thus, pursuant to § 10(j), the Secretary may, as a means of conservation, reintroduce members of a threatened or endangered species into an area of historic habitation and label that new, wild population as experimental.  The Secretary determines whether such experimental populations are essential or nonessential to the continued existence of an endangered or threatened species.  Consistent with such determinations, the Secretary through the FWS, provides control mechanisms

(*e.g.,* controlled takings) where the ESA would not otherwise permit the exercise of such control measures against listed species that are not further categorized as experimental populations.

Reading the ESA as a whole, the Court finds that § 10(j) authorized the FWS to designate the Mexican gray wolf in the BRWRA as an experimental, nonessential population (ENE). Designation of a population as experimental and nonessential increased the FWS's management flexibility.  Under § 10(j), when the FWS reintroduces an experimental population, it promulgates rules that seek to strike a balance between the needs of the reintroduced population and concerns of the human users of that recovery area.  Cheever, Federico, "From Population Segregation to Species Zoning: The Evolution of Reintroduction Law under Section 10(j) of the ESA," 1 Wyo. L. Rev. 287, 293 (2001).  The Mexican Wolf Recovery Plan in 1982,  the Final Environmental Impact Statement for reintroduction of the Mexican gray wolf on April 3, 1997, and the special rules promulgated on January 12, 1998 were designed to provide "considerable management flexibility" and "to reduce potential conflicts between wolves and the activities of governmental agencies, livestock operators, hunters, and others."  Defenders of Wildlife, 797 F. Supp. 2d at 955 (internal citation omitted).

"The objectives of the Wolf Recovery Plan were to maintain a captive population and to re-establish a viable, self-sustaining wild population of Mexican wolves."  Id. (internal citation omitted).  While members of an experimental population do not cease to be part of their threatened or endangered species, ESA § 10(j) allows for special rules to be applied to experimental populations.  Again, § 10(j) provides different rules and/or exceptions with respect to the definition of taking a nonessential experimental population.  "The Mexican gray wolf in the BRWRA, designated as an [ENE], is treated as a species proposed to be listed; ***it is purposefully not afforded***

36

*the same protections as otherwise listed endangered and threatened species*." Id., 797 F. Supp.

2d at 957-58 (emphasis added).

The special rules for the ENE population of Mexican gray wolves are located at 50 C.F.R.

§ 17.84(k).  These rules and regulations identify specific recovery areas in New Mexico for

reintroduction of the wolves.  The special rules relating to experimental populations provide an

exception to the take prohibition that is set forth in ESA § 9; *e.g.,* under the special rules an

"unavoidable and unintentional" take of a wolf in the MWEPA is not a prohibited take.  The same

exception to takes does not exist under ESA § 9, where any type of take of a listed species (not

designated as an experimental population and subject to the special rules) is prohibited.

By definition, an unavoidable and unintentional taking of an ENE wolf is an "accidental,

unintentional take" that occurs "despite reasonable care" provided that such taking is incidental to

an otherwise lawful activity and not done on purpose.  50 C.F.R. 17.84(k)(15) (definitions).  Under

the special rules applied to experimental populations, the taking of a wolf with a trap or other type

of capture device within occupied wolf range would not be considered unavoidable, accidental, or

unintentional, but no violation occurs if "due care was exercised to avoid taking a wolf."  Id.  Thus,

a trapper engaged in lawful trapping of furbearer animals, who was careful and sought to avoid

capturing a wolf, would not violate the law.  In contrast, under the § 9 prohibition on taking, it

matters not if a trapper exercised due care to avoid taking a listed animal.  Any taking of a listed

animal under § 9 is a violation of law, and indeed, ESA § 9 does not contemplate any type of

trapping of a threatened or endangered species that is not an experimental population.

The critical difference between take provisions under ESA § 9 and the special rules is that

ESA § 9 applies to endangered or threatened species, in contrast with experimental populations that

are subject to different take provisions and exceptions in the special rules.  The special rule "is a

37

deviation from the otherwise capacious prohibition on take found at ESA § 9," and "constitutes a marked decrease in protection for the wild Mexican gray wolf population [as compared to § 9]." [Doc. 71, Ex. 1] ("A Petition to U.S. Fish and Wildlife Service to Amend the 1998 Mexican Wolf Section 10(j) Rule so as to Ban all Traps and Snares" (June 10, 2010), submitted by Guardians and others.)  Moreover, importantly, the special rules state that FWS does not intend to change the ENE designation of the Mexican gray wolf to essential experimental, threatened, or endangered and foresees no likely situation that would result in such changes.  50 C.F.R. § 17.84(k)(14).

Defendants are jointly responsible for administering the State's trapping regulations.  The trapping and snaring of protected furbearers, like muskrat, raccoon, weasel, beaver, bobcat, and foxes, is legal within the MWEPA, subject to open season and licensing requirements.  *See* §§ 17-5-1 through 17-5-9 NMSA 1978.  The taking of other protected furbearers, like pine marten, river otter, and coatimundi, is prohibited.  There are no restrictions on the takings of unprotected furbearers like coyotes and skunk.  New Mexico's Game and Fish Department, New Mexico Game & Furbearer Rules and Information ("furbearer rules"), pp. 57-59 (2012-2013 Licensing Year), located at www.wildlife.state.nm.us/publications/documents (furbearer licensing rules & regulations for 2012-2013).  *See also* [Doc. 11, Ex. 6] (Guardians provided excerpts from the furbearer rules).

The Game and Fish Department requires daily trap inspection of every licensed trapped and requires possession of a release device or catch pole to be used to release certain animals.  Each licensed trapper must mark his traps with name, address or Trapper ID number.  The Department prohibits certain types of traps, for example, steel traps with an inside jaw spreader larger than 7.5 inches. [Doc. 11, Ex. 6, at 58.]

Under "Wolf Country" in the furbearer rules, the New Mexico Game and Fish Department states that wolves are a protected species within the Mexican Wolf Restoration Area and that there

are penalties, including jail time and monetary fines, for shooting or killing a wolf.  The Department

sets out recommendations for reducing the potential for injuring trapped Mexican gray wolves,

advising trappers that they would not be held criminally liable for an accidental capture of a

Mexican gray wolf.  Furbearer rules, p. 57.  Thus, while Defendants do not specifically regulate

trapping coyotes or skunks, they do promulgate trapping regulations, requirements, and

recommendations in relation to wolves.  Traps for unregulated furbearers like coyotes can result in

trapping a wolf within the wolf recovery areas.  Neither New Mexico law nor regulations authorize

Defendants to prohibit state residents' trapping of coyotes.

Guardians petitioned the FWS to amend the definition of "unavoidable and unintentional

take" in the special rules to remove incidental trapping as an exception to the special rule's take

prohibition and to ban traps and snares throughout the entire MWEPA. [Doc. 71, Ex. 1, at 1; Doc.

71, Fact No. 24; Doc.  77, Fact No. 24.]  To date, FWS has not amended the special rule in response

to Guardians' petition.

Defendants themselves do not directly engage in the activities of trapping.  However, the

ESA and the special rules contemplate third party liability for a take.  Guardians contends that

Defendants, through issuance of trapping licenses and regulations or non-issuance of pertinent

regulations, cause another party to unlawfully take wolves under the take provisions of ESA § 9 or

the special rules.  Guardians does not allege or demonstrate through evidence that any specific

trapper's actions in taking a Mexican gray wolf resulted from that trapper's failure to exercise due

care.

Between March 2002 and February 2009, documentation and research reveal 10 to 13

instances of wolf trappings in New Mexico (for the purposes of these cross motions only, the Court

assumes the trappings occurred in occupied wolf range).  That information shows that a few of the

39

13 wolves were killed, some were injured, and several were not injured. Research also indicates that there were seventy-eight Mexican wolf mortalities documented during the reintroduction effort between 1998 and 2010, and that 1.3 percent of those mortalities stemmed from trapping incidents. Almost 20 percent of the mortalities was related to natural causes.

### C.   Discussion:

#### 1.   *ESA § 9 Take Provision and Requests for Declaratory Relief*

Guardians argues, in part, that Defendants violated ESA's § 9 take provision in relation to the ENE population of the Mexican gray wolf by either issuing trapping licenses to persons who set traps for other animals, like coyotes, but caught Mexican gray wolves, or by failing to regulate trapping in a way that avoids the capture of wolves. In other words, with respect to alleged violations of ESA § 9, Guardians contends that Defendants, by regulation or omission of regulation, caused others to take Mexican gray wolves through activities of trapping.

First, the Court already determined that ESA § 9 does not regulate the taking of an ENE population of Mexican gray wolves. The ESA § 9 take provision does not supplant the special rule's take provision that expressly controls takings and exceptions to takings of the Mexican gray wolf populations reestablished in the MWEPA and BRWRA. To find otherwise would nullify the special rules and the exceptions of "unavoidable and unintentional" takes of Mexican gray wolves. The Court finds the undisputed material facts demonstrate that the ESA § 9 take provision does not apply to experimental, nonessential populations that are governed by the special rules of 50 C.F.R. § 17.84(k). Guardians fails to present genuine issues of material fact regarding the application of ESA § 9 to ENE populations of Mexican gray wolves.

Second, even if ESA § 9 were applicable, the Court finds Guardians raised no genuine issues of material fact demonstrating that Defendants' regulation or non-regulation of trapping actually

caused trappings of Mexican gray wolves.  The Court observes that not many trappings of wolves occurred in the New Mexico occupied wolf range over the last 7 to 12 years.  While not determinative of the issues before it, the Court notes that over a 12-year period, only a very small percentage of wolf mortalities is attributed to non-project personnel's trapping.  Between 2002 and 2009, only 10 to 13 wolves were trapped in the pertinent recovery areas.  Of those, not all were killed or injured.  Pertinent to the present issue, however, is Guardians' lack of evidence demonstrating that these few trappings of Mexican gray wolves would not have occurred but for Defendants' regulation or non-regulation of trapping.  Guardians presented evidence that wolves were trapped but not that these trappers acted because of regulations or lack of regulations.  Indeed, the special rules contemplate trapping within occupied wolf range.

It is undisputed that Defendants regulate trapping and require licensure for trapping of furbearing animals.  The Department of Game and Fish also provides requirements as to trapping and recommendations to avoid trapping Mexican gray wolves.  Through no fault of Defendants, it is conceivable that wolves were trapped or captured by unlicensed individuals engaged in unlawful trapping activities; it is equally possible that wolves were captured by licensed individuals engaged in lawful trapping activities.  The undisputed material facts fail to show that Defendants directly or indirectly caused such trappings or takes of wolves.  Guardians fails to present disputed material facts as to the issue of causation by third party Defendants.

While Guardians argues that Defendant Director "brought about" the take of wolves captured in traps set for furbearers by issuing the associated trapping licenses, those wolves also could have been captured by individuals without licenses.  Perhaps the only way to *attempt* to reduce all trappings of wolves in wolf recovery areas would be to ban all trapping of any animals, including skunks and coyotes, in those areas.  Even then, unlawful trapping could occur in violation of such

regulations.  The Court is not authorized to impose such an all encompassing ban on trapping, nor are Defendants authorized to change state law or federal regulations to that effect.

The Court determines that the genuine issues of material fact are not in dispute as to Guardians' request for declarations that Defendants violated 16 U.S.C. § 1538(a)(1)(B) (ESA § 9). That statutory provision does not apply to the ENE populations of the Mexican gray wolf, and there is no genuine material issue raised with respect to Defendants' alleged causation under these facts. Thus, the Court denies Plaintiff's request for summary judgment, and grants Defendants' request for summary judgment as to alleged violations of ESA § 9.

### 2. *Special Rules Exceptions to Takes and Requests for Declaratory and Injunctive Relief*

The special rules, at 50 C.F.R. § 17.84 govern the reintroduced ENE population of Mexican gray wolves in New Mexico.  The special rules prohibit takes of Mexican gray wolves in occupied wolf range but exclude the prohibition of takes that are unavoidable and unintentional.  The special rules specifically contemplate trapping within occupied wolf range provided that the trapper exercises due care to avoid taking a wolf by trapping.  "Taking a wolf with a trap, snare, or other type of capture device within occupied wolf range . . . will not be considered unavoidable, accidental, or unintentional take, unless due care was exercised to avoid taking a wolf."  50 C.F.R. § 17.84(k)(15) (definitions)  The special rules do not define the phrase "due care."

Guardians premises Defendants' liability on their failure to regulate furbearer trapping so as to avoid trapping wolves or the incidental capture of Mexican gray wolves.  Guardians argues that Defendants' failures in this regard amount to "but for" causation for the takings.  Guardians disagrees with Defendants's position that to impose liability, Plaintiff would have to demonstrate that Defendants "caused a third party to fail to exercise due care while legally trapping within

42

occupied wolf range." [Doc. 77, at 15.] Guardians asserts that Defendants' omissions or failures to provide more regulation constitute lack of due care.  In support, Guardians finds Holsten, 541 F. Supp. 2d 1073, "particularly instructive on this issue." [Doc. 77, at 15-16.]

The Court, in Holsten, analyzed alleged take violations by the Commissioner of the Minnesota Department of Natural Resources, in the context of trapping and snaring the Canada Lynx.  Id. at 1075.  The Canada Lynx was listed as protected under the ESA, but it was not an experimental population, as is true here where trapping is contemplated.  In Holsten, there were no special rules regarding a reintroduced experimental population, no contemplation of trapping in the federal regulations, and no requirement that trappers exercise due care.  A take, therefore, was defined broadly and included unintentional trappings of Canada Lynxes.  Id. at 1076.  While a taking of the listed species could be allowed if incidental to the purpose of otherwise lawful activity, the proposed trapper had to obtain an Incident Take Permit.  Such permit was not issued in Holsten. Thus, the injunctive relief in Holsten sought to bring the state agency's trapping scheme into compliance with federal law.  Id. at 1081.

> The defendants' argument ignores the distinguishing facts of [other] cases.  First, the states in those cases were not found to be in violation of a congressional act passed pursuant to its constitutional authority. Second, the states in those cases were directed to take positive action with respect to a particular field.  Here, the defendants are not being ordered to take positive steps with respect to advancing the goals of a federal regulatory scheme.   Rather, the court directed the defendants to find a means of bringing the Commonwealth's scheme into compliance with federal law.

Id. at 1081 (*quoting* Strahan, 127 F.3d at 170).

The court, in Holsten, analyzed issues of governmental third party causation, concluding that "for purposes of determining proximate cause, the . . . licensure and regulation of trapping is the 'stimulus' for the trappers' conduct that results in incidental takings."  Moreover, the court

concluded that the trappers' conduct in that case was not an independent intervening cause that broke the chain of causation between the state agency and the taking of the Canada Lynx.  Id. at 1079.  But, again, the key distinction for purposes of the Canada Lynx in Holsten, ESA § 9 did not expressly contemplate trapping.  See Defenders of Wildlife, 797 F. Supp. 2d at 958 n. 7 (noting that Mexican gray wolf, as an ENE, is not afforded the same protections as a listed species like the threatened Canada lynx).

The Court finds Holsten neither binding authority, nor instructive concerning the issues here – whether Guardians presented evidence raising genuine issues of material fact concerning trappers' alleged failure to exercise due care under the applicable special rules.  The Court generally agrees that there may be third party liability under the special rules.  However, here, Guardians failed to present any evidence that there was an underlying unlawful take, or that Defendants' regulations or lack thereof caused individual trappers to capture 10 to 13 Mexican gray wolves without exercising due care.  The Court does not accept Guardians' attenuated position that Defendants' regulation or lack of regulation of trapping creates an impermissible "risk of taking" that "demands liability." [Doc. 77, at 20.]

The Court finds more persuasive Defendants' argument that for Guardians to raise genuine issues of material fact concerning Defendants' alleged third party liability, Guardians must present evidence that Defendants caused a "first party" to incidentally trap a Mexican gray wolf without the exercise of due care. [Doc. 82, at 5-6.] In support of this position, Defendants rely on Coalition for a Sustainable Delta v. McCamman, 725 F. Supp. 2d 1162, 1168 (E.D. Cal. 2010) ("prerequisite to a finding of third party liability . . . is a first party act that exacts a taking").  Guardians attempts to distinguish McCamman by arguing that the case did not impose a threshold liability requirement, but found only that a state could not be held liable for indirectly causing a "take" of a fish by another

44

fish. [Doc. 46, at 16.] Yet, Guardians quoted a portion of the decision in <u>McCamman</u> stating that "[t]he  prerequisite to a finding of third party liability, however, is a first party act that exacts a taking." [Doc. 46, at 16] (*quoting* <u>McCamman</u>, 725 F. Supp. 2d at 1168 (internal citations omitted)).

In sum, the Court concludes that Guardians failed to demonstrate genuine issues of material fact exist with respect to trappers having failed to exercise due care in capturing any of the Mexican gray wolves.  Thus, without the existence of material facts concerning first party liability, it follows that there are no genuine issues of material fact concerning Defendants' alleged third party liability. In other words, without demonstrating genuine issues of material facts as to trappers' alleged lack of due care, there can be no unlawful take under the special rules, and therefore, Defendants could not have "caused" an unlawful take.

The Court determines that the genuine issues of material fact are not in dispute as to Guardians' request for declarations that Defendants violated 16 U.S.C. § 1538(a)(1)(B) (ESA § 9) and 50 C.F.R. § 17.84(k) by authorizing trapping within occupied wolf range without first exercising due care to avoid taking a Mexican gray wolf.  The Court also finds that the genuine issues of material fact are not in dispute as to Guardians' request for injunctive relief requiring Defendants exercise due care to avoid taking Mexican gray wolves before authorizing any trapping within occupied wolf range.  In order to raise a genuine issue of material fact with respect to Defendants' alleged violation of the special rule, Guardians needed to present evidence that the trappers using traps in which the wolf was caught (in wolf occupied range)[11] failed to exercise due care.  This, it

---

[11]As already noted, the Court makes no determination as to whether the trapped wolves were in occupied range and instead, assumes for purposes of deciding these cross motions, that at least some of the 10 to 13 wolves were captured in wolf occupied range.

failed to do.   Thus, the Court denies Plaintiff's request for summary judgment, and grants Defendants' request for summary judgment as to alleged violations of the special rule.

IT IS THEREFORE ORDERED that:

(1)  Defendant-Intervenors motion to join Defendants' motion to dismiss [Doc. 23] is GRANTED;

(2) Defendants motion to dismiss for failure to state a claim [Doc. 19] is GRANTED;

(3) WildEarth Guardians cross motion for summary judgment [Doc. 11 is DENIED; and

(4) Defendant-Intervenors' cross motion for summary judgment [Doc. 72] is DENIED as it was made moot; and

(5)  Defendants' cross motion for summary judgment [Doc. 71] is GRANTED, with the result that Plaintiff's complaint is dismissed, with prejudice.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge